# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**WINSTON BERNARD EISON,**

    **Plaintiff,**

  v.                                      Case No. 12-CV-931

**TONIA ROZMARYNOSKI,**

    **Defendant.**

## DECISION AND ORDER

Plaintiff, a Wisconsin state prisoner, is proceeding in forma pauperis on a claim under 42 U.S.C. § 1983 that his Eighth Amendment rights were violated by defendant's refusal to permit him to shower and decontaminate after he cleaned a cell in which an incapacitating gas was used. Defendant has filed a motion for summary judgment. For the reasons set forth herein, defendant's motion will be granted.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## FACTS[1]

Defendant, Tonia Rozmarynoski, is a correctional sergeant at Green Bay Correctional Institution (GBCI). Plaintiff, Winston Eison, was incarcerated at GBCI from January 27, 2009 to February 22, 2013.

Plaintiff held an inmate work assignment as a janitor in the segregation building at GBCI from January 5, 2011 until December 27, 2012. His shift was from 2:00 p.m. to 10:00 p.m. One of plaintiff's duties consisted of cleaning a cell after prison staff sprayed incapacitating agents into the cell holding a disruptive inmate. Once the disruptive inmate was removed from his cell, staff members would enter the cell to perform a cell search and secure the inmate's property. At some point after that, staff would escort an inmate janitor(s) into the cell to clean it.

---

[1] Relevant facts are taken from Defendant's Proposed Findings of Fact and Plaintiff's Proposed Findings of Fact.

There were two incidents on August 3, 2011, where staff deployed incapacitating agents into inmates' cells. The first incident occurred around 2:00-3:00 p.m. and the second incident occurred around 6:00 p.m.

With regard to the first incident, plaintiff and another inmate, Roy Jones, Jr., were ordered to clean a cell after the disruptive inmate was removed from the cell and secured. The segregation unit was out of protective overalls and officers advised plaintiff and Mr. Jones that they would have to clean the cell with what they had on, "which consisted of rubbers, pants, t-shirt, rubber gloves, a painter's mask to cover our mouths, and eye goggles." (Eison Aff. ¶ 7.) The corridor leading to the cell was still heavy with fumes. Plaintiff asked if they could return later to clean the cell but they were ordered to clean the cell at that time. (Eison Aff. ¶¶ 9-10.) An industrial fan was placed at the end of the corridor, but plaintiff was still gagging and coughing due to the strength of the gas odors in the air. (Eison Aff. ¶ 11.) The cell was saturated with heavy gas residue which required using a power water sprayer. (Eison Aff. ¶ 12.) According to plaintiff, in the course of scrubbing the cell, the gas residue covered his body causing burning sensations. (Eison Aff. ¶¶ 13-14.)

The second incident occurred that evening. At about 6:00 p.m., Captain Ryan Baumann and other prison staff performed a cell extraction of a disruptive inmate. Staff introduced three controlled bursts of an incapacitating agent (Orthochlorobenzylidene Malononitrile, also known as "CS" or tear gas) into the disruptive inmate's cell.

Plaintiff and Mr. Jones were ordered to clean the cell. While Captain Baumann does not know the exact time that plaintiff was escorted over to clean the cell, he believes even more time than is typical passed because the disruptive inmate was escorted to a cell

3

nearby (approximately thirty feet away from his initial cell), and the inmate had been very combative. Due to the inmate's continued resistance, the staff who would have typically escorted plaintiff into the cell to clean were busy attempting to gain compliance of the disruptive inmate and did not have the time to escort a janitor to the cell for a prolonged period of time. Staff would not have escorted plaintiff to the contaminated cell until they were confident that the area was secure. Further, in this instance, a fan commonly referred to as a "Super Vac" was used in the hallway for a period of time after the cell extraction. When the fan is used, inmate janitors do not enter the cells for an additional period of time.

According to plaintiff, once he and Mr. Jones arrived to clean the cell, the smell of gas in the air was so strong that they asked if they could return later to clean the cell but they were ordered to clean the cell at that time. (Eison Aff. ¶ 18.) To clean the cell, Mr. Jones used a power sprayer and plaintiff scrubbed the walls and other surfaces of the cell. (Eison Aff. ¶ 20.) When plaintiff exited the cell he was saturated with "pepper spray" and his skin felt like it was on fire. (Eison Aff. ¶ 21.)

Plaintiff finished cleaning the cell shortly after 9:00 p.m. Plaintiff avers that he informed Officers Jimenez and Pickle that his skin felt like it was burning and that he needed a shower as soon as possible. (Eison Aff. ¶ 22.) According to defendant, had plaintiff appeared to be in any kind of medically significant distress immediately after cleaning the cell, he would not have been sent back to his cell hall; staff would have contacted the Health Services Unit if they believed that he required medical attention. (Rozmarynoski Aff. ¶ 10.) According to plaintiff, Officer Pickle told him he would receive a decontamination shower after he returned to his unit following the security count. Plaintiff

4

asserts that if he had known that defendant was going to deny him a decontamination shower he would have demanded medical attention prior to returning to his unit while still in the segregation building. (Eison Aff. ¶¶ 25-26.)

Plaintiff was sent back to his cell hall so he would not miss "count," which took place at 9:20 p.m. Institution rules dictate that the showers in the general population bath house close at 9:00 p.m. and, therefore, the showers were closed once plaintiff returned to the cell hall. Instead of providing plaintiff with access to a shower, defendant advised him to take a bird bath in his cell. A "bird bath" is an alternative method of hygiene in the prison setting in which inmates wash themselves using the sinks in their own cells. (Rozmarynoski Aff. ¶ 12; Lutsey Aff. ¶ 14.)

Plaintiff avers that he told defendant he was in pain from being exposed to "pepper spray" for over a seven hour period. He requested a shower after count but defendant denied the request and instead advised that he could take a bird bath in his cell. (Eison Aff. ¶ 28.) Plaintiff also avers that he asked to see a supervisor and a nurse, but defendant refused. (Eison Aff. ¶ 29.)

Defendant understood that, subsequent to the cell extractions, plaintiff cleaned the inmate's cells as part of his janitorial duties. Based on her first-hand experience and training, defendant understood how gas agents are typically used. It was her understanding that the agent is designed to cause temporary irritation when directly deployed. It was also defendant's understanding that typical practice would be to employ a fan or other means to clear out a gas before others, including janitors, enter a cell. Either way, it was defendant's understanding that typical practice is that a janitor would not immediately enter a cell after a gas is used, and that, soon after being deployed, a gas

5

agent will settle out of the air and cease to have the same effect.  Because plaintiff was not directly sprayed with the incapacitating agent, but rather cleaned the cells subsequent to the cell extractions, defendant believed that rinsing the affected areas would suffice and that this could be accomplished with a "bird bath."

Plaintiff returned to his cell, took off his clothes, and yelled for nurse or supervisor. An officer stopped by and plaintiff asked him to see a nurse or supervisor.  Plaintiff did not see a nurse or supervisor that night.  He attempted to wash the "pepper spray" residue off his body but because of the cramped, small, narrow cell space he could not adequately clean his body.  His skin continued to burn because he could not properly clean the affected areas.  He could not sleep well that night due to the severe pain he was suffering.

Plaintiff received a shower the next day around 12:45 p.m.  He noticed a large dark colored ring around both armpits and they felt raw.  Plaintiff saw Dr. Heidorn on August 30, 2011, and while plaintiff asserts that they discussed his armpit rash, progress notes indicate that plaintiff was seen regarding a knee issue on that date.  (Docket 75-1 at 27.) On September 16, 2011, plaintiff saw a nurse who documented that his armpits appeared irritated.  Id.  Nursing staff subsequently documented that this issue was unrelated to cleaning cells on August 3, 2011.  (Docket 1-1 at 14.; Fonder Aff. ¶ 6, Exh. 106 at 8.)

Nurse Jean Lutsey has firsthand familiarity with the clinical effects of incapacitating agents used within the prison setting.[2]  CS tear gas can cause symptoms such as skin irritation, runny nose, coughing, and burning of the eyes.  Recovery begins upon exposure to fresh air and is usually complete in fifteen to thirty minutes.  (Lutsey Aff. ¶ 4; Exh. 104

---

[2] Jean Lutsey, R.N., has been licensed as a Registered Nurse since July 1997, and has been employed by DOC as a Nurse Clinician 2 in the Health Services Unit at GBCI since January 13, 2003.

at 4.) Chemical agents are specifically designed to impart the desired effect during primary exposure. Primary exposure means direct exposure to the gas when first deployed by security staff into the air. Throughout Nurse Lutsey's tenure with the DOC she has treated dozens of inmates subsequent to their primary exposure to incapacitating gas agents, including CS gas. In treating those inmates, she has assessed symptoms of irritation and temporary discomfort to the eyes, skin, face, and lungs, and other burning or irritation symptoms. (Lutsey Aff. ¶ 6.) However, it is not Nurse Lutsey's experience that inmates primarily exposed to the gas have suffered from any life-threatening or other serious medical symptoms. Id. When an inmate primarily exposed suffers from irritation symptoms, appropriate treatments may include removal of exposed clothing, rinsing or showering of the affected areas, and irrigating the eyes. (Lutsey Aff. ¶ 7.)

Although inmates sometimes seek treatment after primary exposure, Nurse Lutsey has never had occasion to treat anyone with secondary exposure. Secondary exposure refers to someone who was not directly exposed to the deployment of the gas agent, but rather was in the area where the gas agent was deployed subsequent to it having been deployed. Although Nurse Lutsey has been in her position for approximately ten years and has seen inmates suffering irritation after primary exposure, she is not aware of an inmate having sought medical attention after having been secondarily exposed, nor has she ever treated an inmate janitor for exposure after cleaning a cell. (Lutsey Aff. ¶ 8.)

At GBCI, after direct exposure to an incapacitating agent, the inmate is removed from the affected cell and their contaminated clothes are removed. Primarily exposed inmates are allowed an opportunity for a shower if they are experiencing symptoms from exposure. If, after showering, the inmate wants to be seen by medical personnel, staff take

their vital signs, oxygen saturation level, and auscultate their lung sounds. Because these measures of physiological statistics typically tend to be within normal limits, the inmate is reassured that he is physically stable. If the primarily-exposed inmate continues to complain of eye irritation, his eyes are flushed with a saline irrigation. If he is wheezing or having difficulty breathing, he may be given two puffs of an Albuterol inhaler. In the rare instance that symptoms persist beyond four hours, the primarily-exposed inmate is either seen by a physician, or the physician on-call is contacted. During the times that Nurse Lutsey has treated inmates who have had primary exposure to a chemical agent, she has never had occasion to notify a physician, nor has she ever treated an inmate who had any type of lasting effects.

Medical staff often suggest bird baths to inmates who request extra showers. When inmates take bird baths, they bend over their sink and use their hands to flush the affected area with cold water. Nurse Lutsey understands the plaintiff in this case to allege that he suffered symptoms after cleaning a cell after a gas agent was used on another inmate. It is Nurse Lutsey's opinion, based on her training and experience assessing and treating inmates with primary exposure to gas agents, that a person secondarily exposed to a gas agent by cleaning the cell would not require medical attention because irritation, if any, would be minimal and short-lived. That is because the gas agent functions by irritating the skin, eyes, and lungs when deployed, but the same significant irritation would not occur after the agent has been deployed and was no longer suspended in a high concentration in the air. In the event that a person was secondarily exposed to an incapacitating agent and did suffer signs of irritation, the appropriate response would be to rinse the affected

8

areas. Unlike with primary exposure, a person secondarily exposed would not be at risk for more serious symptoms that might occur with primary exposure.

Section DOC 306.09(6), Wis. Admin. Code, provides: "As soon as possible after an incapacitating agent has been used, staff shall provide exposed inmates an opportunity for any necessary hygienic needs and shall consult with medical staff who shall provide any appropriate medical care."[3] According to defendant, she was not aware that the policy applied to anyone other than the inmate who was the direct subject of the incapacitating agent. However, after the incident Captain Zanon discussed the incident with defendant and advised that in the event that inmate janitors are involved with cleaning contaminated cells, that it was Captain Zanon's view that an inmate should be allowed to take a shower afterward.

On August 16, 2011, plaintiff submitted Offender Complaint GBCI-2011-17105 alleging that Sergeant Bristol (now known as Rozmarynoski, the defendant) would not let him shower after coming into contact with incapacitating agents. In that complaint, plaintiff sought the following relief: (1) "to better train the staff; (2) a "reprimand" against then-Sgt. Bristol (now Rozmarynoski), and (3) "compensation for my pain and suffering." (Rose Aff. ¶ 8, Exh.102 at 8.)

---

[3] The Appendix to Chapter DOC 306 states in relevant part:

> This rule requires appropriate medical care, if necessary, and an opportunity for hygienic care. "Exposed inmates" are not just those against whom the agent is used but those exposed to it because they are nearby. Medical examinations and cleaning may minimize the risk of permanent injury, and a change of clothes and bedding minimizes risks to the health of inmates from the residue of incapacitation agents as well as the discomfort they may cause.

Wis. Admin. Code § DOC 306.09(6), Appendix Notes.

9

Institution Complaint Examiner Catherine Francois responded on September 6, 2011, stating that Captain Zanon had addressed the issue by telling defendant that in the future she should "allow inmate workers who have returned from such tasks to take a shower." Ms. Francois recommended that the inmate complaint be affirmed:

> Inmate Eison complains that Sgt. Rozmarynoski did not let him take a shower after coming into contact with incapacitating agents (he is a segregation janitor).
>
> Capt. Zanon was contacted for this issue. She talked with Sgt. Rozmarynoski, who stated she didn't feel the inmate needed a full shower, and though[t] that a "bird bath" would be sufficient. She was informed by Sgt. Zanon that in situations where seg janitors are involved in cleaning contaminated cells and are not able to take a shower in seg (like they normally would) due to time constraints, lack of staff, etc., she is to exercise common sense and allow inmate workers who have returned from such tasks to take a shower either in the bath house, or if it's already shut down for the night to send them to Dorm A. I feel that Sgt. Zanon appropriately addressed this issue.
>
> Recommendation: Affirm to the extent that the inmate should have been provided with a shower but he was not. I feel that this issue was appropriate[ly] addressed by (

(Rose Aff. ¶ 9; Exh. 102 at 2).

The Reviewing Authority, Warden Michael Baenen, issued a decision affirming Ms. Francois's recommendation. (Rose Aff. ¶ 10; Exh. 102 at 3.) The decision from Warden Baenen stated: "A complainant dissatisfied with a decision may, within 10 calendar days after the date of the decision, appeal that decision by filing a written request for review with the Corrections Complaint Examiner on form DOC-405 (DOC 310.13, Wis. Admin. Code)." (Rose Aff. ¶ 11; Exh. 102 at 3.) Plaintiff did not appeal Warden Baenen's decision. (Rose Aff. ¶ 13.) According to plaintiff, he did not appeal the decision because he was dissatisfied with it. (Eison Aff. ¶ 53.)

**ANALYSIS**

Defendant contends that plaintiff failed to exhaust his administrative remedies. Alternatively, she contends that plaintiff's deliberate indifference claim fails on the merits because his shower request was not a serious medical need and because defendant did not act with deliberate indifference. Plaintiff contends that he did exhaust his administrative remedies and that defendant was deliberately indifferent to his serious medical need.

A. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act (PLRA) provides in pertinent part that

> [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Exhaustion of administrative remedies is a condition precedent to suit. Dixon v. Page, 291 F.3d 485, 488 (7th Cir. 2002) (citing Perez v. Wis. Dep't of Corr., 182 F.3d 532, 535 (7th Cir. 1999)). Section 1997e applies to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). The PLRA exhaustion requirement requires "proper exhaustion," meaning that a prisoner must complete the administrative review process in accordance with the applicable procedural rules. Woodford v. Ngo, 548 U.S. 81, 88, 93 (2006). Exhaustion is an affirmative defense, and the burden of proof is on the defendants. Dole v. Chandler, 438 F.3d 804, 809 (7th Cir. 2006) (citing Dale v. Lappin, 376 F.3d 652, 655 (7th Cir. 2004)).

The Inmate Complaint Review System (ICRS) within the Wisconsin prisons is the administrative remedy available to inmates with complaints about prison conditions or the

actions of prison officials. Wis. Admin. Code § DOC 310.01(2)(a). The Wisconsin Administrative Code provides that before an inmate may commence a civil action, the inmate shall exhaust all administrative remedies that the DOC has promulgated by rule. Wis. Admin. Code § DOC 310.05. The ICRS is available for inmates to "raise significant issues regarding rules, living conditions, staff actions affecting institution environment, and civil rights complaints." Wis. Admin. Code § DOC 310.08(1).

To use the ICRS, an inmate must file a complaint with the Institution Complaint Examiner within fourteen days after the occurrence giving rise to the complaint. Wis. Admin. Code §§ DOC 310.07(1) & 310.09(6). After reviewing and acknowledging each complaint in writing, the Institution Complaint Examiner either rejects the complaint or sends a recommendation to the "appropriate reviewing authority." Wis. Admin. Code §§ DOC 310.11(2) & 310.11(11). The appropriate reviewing authority makes a decision within ten days following receipt of the recommendation. Wis. Admin. Code § DOC 310.12. The appropriate reviewing authority shall do one of the following: 1) dismiss the complaint; 2) dismiss the complaint with modifications; 3) affirm the complaint; 4) affirm the complaint with modifications; or 5) return the complaint to the Institution Complaint Examiner for further investigation. Wis. Admin. Code § DOC 310.12(2).

An inmate may appeal an "adverse decision" under § DOC 310.11(6), which provides for an appeal of a rejected inmate complaint, or § DOC 310.13, which provides for an appeal by a complainant dissatisfied with a reviewing authority decision. Wis. Admin. Code § DOC 310.07(4). If an inmate complaint is affirmed, the "department shall implement the affirmed decision within 30 working days from the date of decision." Wis. Admin. Code § DOC 310.15(1). If an affirmed complaint is not implemented within that

12

time period, "the complainant may directly inform the decision-maker in writing of the failure to implement the decision." Wis. Admin. Code § DOC 310.15(2).

Defendant contends that plaintiff failed to exhaust because, although the reviewing authority affirmed GBCI-2011-17105, plaintiff was not granted the relief he sought. Thus, according to defendant, plaintiff was dissatisfied with the decision and required to appeal the decision to the Corrections Complaint Examiner under § DOC 310.13. Plaintiff contends that he was not required to appeal the reviewing authority's decision affirming GBCI-2011-17105 because he was not dissatisfied with the decision. Defendant charges that plaintiff's argument is without merit because if plaintiff had been satisfied the issue would have been resolved and he would not have filed this lawsuit. According to defendant, the fact that plaintiff failed to exhaust is shown by Booth v. Churner, 532 U.S. 731 (2001).

In Booth, a Pennsylvania inmate filed an administrative grievance complaining that correctional officers abused and used excessive force against him. 532 U.S. at 734. He sought injunctive relief and money damages. Id. at 735. The prison authority denied relief. Id. The inmate filed an administrative grievance but he did not go beyond the first step, and never sought intermediate or final administrative review. Id. At some point the inmate was transferred to another institution, so monetary relief was the only relief he still sought. Id. The Pennsylvania grievance system had no provision for recovery of money damages at that time. Id. at 734. The Court framed the issue as whether a grievance system is available where the administrative process has authority to take some action in response to a complaint, but not the remedial action an inmate demands to the exclusion of all other forms of redress. Id. at 736. The Court held that the PLRA requires administrative

exhaustion even where the grievance process does not permit an award of money damages and the prisoner seeks only money damages, provided the grievance tribunal has authority to take some responsive action. 532 U.S. at 741. Thus, because the inmate did not seek intermediate or final administrative review, he did not exhaust.

Here, plaintiff's inmate complaint sought three separate forms of relief – (1) to better train the staff; (2) a reprimand against defendant; (3) compensation for pain and suffering. Plaintiff's grievance was affirmed - his issue was that defendant did not provide him with a shower and the reviewing authority determined that he should have been given a shower. However, his grievance was affirmed only "to the extent that [he] should have been provided with a shower but was not." Thus, it appears that under Booth, because plaintiff's requested relief was not implemented, he needed to complete the exhaustion process, i.e., file an appeal to the Corrections Complaint Examiner, with regard to that relief.

However, the Wisconsin Administrative Code muddies the issue because it does not appear to require inmates to appeal offender complaints that are affirmed. See Wis. Admin. Code § DOC 310.07(4) ("An inmate may appeal an adverse decision under s. DOC 310.11(6) or 310.13.") (emphasis added). As indicated, the issue of plaintiff's inmate complaint was that he should have been given a shower and the reviewing authority agreed with plaintiff and determined that a shower should have been provided. I do not interpret this outcome as an "adverse decision." Even if it were considered an adverse decision, plaintiff may not appeal under the first provision, 310.11(6), which covers rejected inmate complaints. The second provision, 310.13(1), permits an appeal when an inmate is "dissatisfied with a reviewing authority decision." Here, plaintiff avers that he was not dissatisfied. Although defendant does not believe that plaintiff could be satisfied because

14

he did not receive his requested relief and because he filed this lawsuit, the reviewing authority found in his favor on the central issue of his grievance. Thus, I do not find it incredible that he was not dissatisfied with the outcome of the reviewing authority's decision on GBCI-2011-17105.

"To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require." Pozo v. McCaughtry, 286 F.3d 1022, 1025 (7th Cir. 2002). Here, it appears that plaintiff has done all that is required under the Wisconsin Administrative Code. Therefore, I will not dismiss this case for failure to exhaust administrative remedies.

B. Deliberate Indifference

To make out an Eighth Amendment claim based on prison conditions, an inmate must show that he has suffered an objectively, sufficiently serious injury, and that prison officials inflicted the injury with deliberate indifference. Farmer v. Brennan, 511 U.S. 825, 834 (1994). An objectively, sufficiently serious injury is one that deprives the inmate "the minimal civilized measure of life's necessities. Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Only extreme deprivations will support an Eighth Amendment claim. Delaney v. DeTella, 256 F.3d 679, 683 (7th Cir. 2001). Prison officials are deliberately indifferent to deprivations suffered by inmates if they have knowledge of the condition but refuse to take steps to correct it. Dixon v. Godinez, 114 F.3d 640, 645 (7th Cir. 1997). In the medical care context, deliberate indifference has both an objective and a subjective element: the inmate must have an objectively serious medical condition, and the defendant must be subjectively aware of and consciously disregard the inmate's medical need. Farmer, 511 U.S. at 837.

The parties characterize the objective prong of plaintiff's Eighth Amendment claim as whether he was suffering from a serious medical need when defendant denied him a shower. A serious medical condition is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would perceive the need for a doctor's attention. See Edwards v. Snyder, 478 F.3d 827, 830-831 (7th Cir. 2007); Foelker v. Outagamie Cnty., 394 F.3d 510, 512-13 (7th Cir. 2005). A condition is also objectively serious if "failure to treat [it] could result in further significant injury or unnecessary and wanton infliction of pain." Hayes v. Snyder, 546 F.3d 516, 522 (7th Cir. 2008) (citing Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir. 1997)).

According to plaintiff, he had to seek medical attention from secondary exposure to pepper/CS spray due to skin irritation, pain, and burning of his skin. However, plaintiff's claim that he was treated for secondary exposure to pepper spray is not supported by the evidence cited. The medical record cited refers to a nurse visit on September 16, 2011, a month and a half after the exposure. (Docket 75-1 at 27.) At that visit, although plaintiff reported that his skin irritation was caused by indirect exposure to an incapacitating agent, the nurse never made such a finding. Subsequently, Health Services Unit Manager Jeananne Zwiers gave the following description of that visit when Eison challenged the $7.50 co-pay he was charged for it: "Per my review, copay was charged correctly for the 9/16/11 appointment based on the fact that it is unlikely that he would have a rash solely in his armpits due to cleaning a cell with CS in it." (Dkt. 1-1 at14; see also Fonder Aff. ¶6, Exh. 106 at 8.)

It is doubtful that the effects of plaintiff's secondary exposure to CS spray is serious medical need under the Eighth Amendment. "Exposure to pepper spray is not a serious

16

medical need." Bonnin v. Eau Claire Cnty., No. 03 C 0065, 2004 WL 67478, at *4 (W.D. Wis. Jan. 13, 2004); see Rivera v. MacAdory, No. 96 C 4674, 1997 WL 17811, at *3 (N.D. Ill. Jan. 16, 1997) ("It is doubtful that the lingering unpleasant effects of the mace amounted to a 'serious medical need.'"). However, despite the lack of evidence in plaintiff's medical records supporting his assertion that the exposure to CS caused his rash, he avers that he was in severe pain after cleaning the cells and that he told defendant he was suffering and wanted to take a shower and see a nurse. He also avers that his armpits were affected, painful, and burning the evening of the incidents. I will assume therefore that plaintiff had an objectively serious medical need.

Plaintiff claims that he told defendant he was in severe pain from the effects of seven hours of exposure to OC spray and requested a shower and to see a nurse. According to defendant, because plaintiff was not directly sprayed with the incapacitating agent, but rather cleaned the cells subsequent to the cell extractions, she believed that rinsing the affected areas would suffice, and that this could be accomplished with a bird bath. In addition, the showers were closed for the night. Plaintiff does not does not dispute that the showers were closed. He charges that defendant's failure to permit him to shower violated his constitutional rights.

Following plaintiff's inmate complaint on this issue, it was determined that defendant should have used common sense and permitted the shower. However, defendant's failure to use "common sense" or, for that matter, to follow institution rules, does not equate to a constitutional violation; a violation of state laws or regulations is not a basis for a federal civil rights suit. See Guajardo-Palma v. Martinson, 622 F.3d 801, 806 (7th Cir. 2010); Domka v. Portage Cnty., Wis., 523 F.3d 776, 784 (7th Cir. 1984). In addition, negligent

conduct on the part of a state official is insufficient to make out a constitutional violation. Daniels v. Williams, 474 U.S. 327, 331, 333-34 (1986); Davidson v. Cannon, 474 U.S. 344, 347-48 (1986); Russ v. Watts, 414 F.3d 783, 788-89 (7th Cir. 2005).

The record reveals that the showers were closed for the evening. Defendant refused plaintiff a shower based on that and because she thought that a bird bath was sufficient under the circumstances. She knew that plaintiff was not directly exposed to OC spray but rather had cleaned cells that had been contaminated with OC spray that day. Defendant also knew that janitors who do that job enter the cells some time after the OC spray is administered and are wearing protective gear. There is no indication that defendant knew that the regular protective gear was unavailable that day. In any event, it is undisputed that plaintiff entered the cell wearing "rubbers, pants, t-shirt, rubber gloves, a painter's mask to cover our mouths, and eye goggles." In addition, while CS tear gas can cause symptoms such as skin irritation, runny nose, coughing, and burning of the eyes, recovery begins upon exposure to fresh air and is usually complete in fifteen to thirty minutes. Finally, defendant knew that there was a method for plaintiff to wash off in his cell and she directed him to do so.[4] Although the better course of action may have been to allow plaintiff a shower that night, defendant did not disregard plaintiff's medical need. Therefore, she was not deliberately indifferent.

### Additional Matters

---

[4] Plaintiff submitted case law suggesting that defendant's failure to provide him a shower demonstrates deliberate indifference. However, these cases are distinguishable because the inmates were all present when the incapacitating agents were deployed. See Clement v. Gomez, 298 F.3d 898 (9th Cir. 2002); Campbell v. White, Case Number 07-CV-19, 2009 WL 277634 (E.D. Mo. Feb. 5, 2009); Brown v. Williams, Case No. 09-CV-791, 2011 WL 386853 (E.D. Cal. Feb. 3, 2011). Under the circumstances, defendant was not deliberately indifferent.

On August 25, 2014, plaintiff filed a document titled Plaintiff's Notice of Motion and Response Brief in Support of Motion to Compel Discovery and Request for Reconsideration to Hear this Motion (Docket 62). However, I addressed plaintiff's motion to compel in an order filed August 18, 2014. For the reasons set forth in that order, plaintiff's motion will be denied.

Plaintiff has filed a motion to strike defendant's affidavits of Welcome Rose and Ryan Baumann because they were not identified in certain discovery requests regarding potential witnesses. However, defendant's objections to plaintiff's requests for trial witnesses as premature were valid. See Edeh v. Equifx Info. Servs. LLC, Case Number 11-2671, 2013 WL 1749912 *19 (D. Minn. April 23, 2013). Thus, plaintiff's motion to strike will be denied.

**THEREFORE, IT IS ORDERED** that defendant's motion for summary judgment (Docket # 16) is **GRANTED**.

**IT IS FURTHER ORDERED** that motion for reconsideration (Docket # 62) is **DENIED**.

**IT IS FURTHER ORDERED** that plaintiff's motion to strike (Docket # 75) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 29th day of September, 2014.

                        s/ Lynn Adelman
                        _____
                        LYNN ADELMAN
                        District Judge